NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0057-24

UAW, REGION 9 OF THE UAW,
and C.E.A.S.E. N.J.,

     Plaintiffs-Appellants,

v.

NEW JERSEY GOVERNOR
PHILIP MURPHY and ACTING
NEW JERSEY HEALTH
COMMISSIONER DR. KAITLIN
BASTON,

     Defendants-Respondents.

_____

CASINO ASSOCIATION OF
NEW JERSEY, UNITE HERE LOCAL 54,
INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 68,
EASTERN ATLANTIC STATES
REGIONAL COUNCIL OF
CARPENTERS, INTERNATIONAL
UNION OF PAINTERS AND ALLIED
TRADES, DISTRICT COUNCIL 21,
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, LOCAL 331, AND
ATLANTIC AND CAPE MAY COUNTY
BUILDING & CONSTRUCTION
TRADES COUNCIL ("Unions"),

     Intervenors-Respondents.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **January 26, 2026** |
| **APPELLATE DIVISION** |

Argued December 15, 2025 – Decided January 26, 2026

Before Judges Sabatino, Natali and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Mercer County, Docket No. C-000026-24.

Nancy Erika Smith argued the cause for appellants (Smith Mullin, PC, attorneys; Nancy Erika Smith, of counsel and on the briefs).

Brett J. Haroldson, Deputy Attorney General, argued the cause for respondents New Jersey Governor Philip Murphy and New Jersey Health Commissioner Dr. Kaitlin Baston (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Robert J. McGuire and Brett J. Haroldson, Deputy Attorneys General, on the brief).

Christopher Porrino argued the cause for intervenor-respondent Casino Association of New Jersey (Lowenstein Sandler LLP, attorneys; Christopher Porrino, Peter Slocum and C. Patrick Thomas, of counsel and on the brief).

Raymond G. Heineman, Jr., argued the cause for intervenors-respondents Unite Here Local 54, International Union of Operating Engineers, Local 68, Eastern Atlantic States Regional Council of Carpenters, International Union of Painters and Allied Trades, District Council 21, International Brotherhood of Teamsters, Local 331, and Atlantic and Cape May County Building & Construction Trades Council (Kroll, Heineman, Ptasiewicz & Parsons, LLC, attorneys; Raymond G. Heineman, Jr. and Seth Ptasiewicz, on the brief).

2

A-0057-24

Jennifer Brooks Condon argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Farrin R. Anello, Molly K.C. Linhorst, Ezra D. Rosenberg, Jeanne LoCicero, on the brief).

Kathryn K. McClure argued the cause for amicus curiae Americans for Nonsmokers Rights (McClure Burden LLC, attorneys; Kathryn K. McClure, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This appeal involves state constitutional challenges raised by plaintiffs, a labor union and an anti-smoking advocacy group of Atlantic City casino employees, to the casino exemption within the New Jersey Smoke-Free Air Act ("the Smoke-Free Air Act"), codified at N.J.S.A. 26:3D-59(e). The Act generally prohibits smoking in indoor public places and workplaces in New Jersey but expressly excludes, among a few other places, certain designated areas within casinos and casino simulcasting facilities. During the COVID-19 pandemic, temporary executive orders briefly suspended casino smoking, but the exemption thereafter was revived.

Although the Legislature has repeatedly considered, but not enacted, amendments to eliminate the casino exemption, the current litigation presents

this court with the question of whether Section 3D-59(e) violates asserted state constitutional rights.

Representing thousands of New Jersey casino workers exposed to secondhand smoke, plaintiffs brought suit in the Chancery Division, seeking injunctive and declaratory relief on the grounds that the exemption (1) violates a state constitutional "right to safety," (2) comprises unconstitutional "special legislation," and (3) denies equal protection under the New Jersey Constitution. They emphasized the documented science and the legislative findings in the Smoke-Free Air Act confirming that sustained exposure to secondhand smoke can produce severe, and at times fatal, adverse health consequences. Plaintiffs are supported in the case by two amicus curiae.

Joined by intervenors from the casino industry and certain other labor unions, the State defendants argued the casino smoking exemption is constitutional as a valid legislative policy choice grounded in an irrefutable rational basis. They principally contend the imposition of a ban will drastically reduce the number of casino patrons in Atlantic City and thereby cause a massive loss of casino revenues, jobs, and State tax proceeds. To support that contention, respondents presented to the trial court a 2021 industry-funded study projecting such drastic losses of patronage and revenues.

4 A-0057-24

Plaintiffs contend the industry study and its dire predictions of revenue loss are greatly exaggerated and unreliable. They have presented a competing 2022 study that sharply critiques the industry study and makes its own contrary predictions.

The trial court considered these clashing assertions based solely on written submissions, without hearing any testimony and apparently without the benefit of discovery. The court denied both preliminary and permanent injunctive relief and dismissed all of plaintiffs' claims with prejudice.

The trial court did find that plaintiffs, in their arguments for a preliminary injunction, had shown irreparable harm may be caused to the employees through their continued exposure to secondhand smoke in their workplace, given what it recognized as the "undisputed" research documenting such adverse health effects. Nevertheless, the court ruled their constitutional arguments to invalidate the exemption were unavailing.

In particular, the trial court concluded that no standalone "fundamental" right to safety exists under Article I, Paragraph 1 of the New Jersey Constitution. The court also rejected plaintiffs' argument that the casino smoking exemption is invalid special legislation under Article IV, Section VII. The court further reasoned that plaintiffs' state equal protection claim, which the court analyzed

A-0057-24

under what it deemed to be a "rational basis" standard, was also untenable. Consequently, the court granted respondents' motions to dismiss the lawsuit with prejudice and, implicitly, denied any permanent injunctive relief.

For the reasons that follow, we affirm the trial court's denial of plaintiffs' request for a preliminary injunction to restrain the smoking exemption, on the record as presented in the order to show cause. We agree with the trial court that the Supreme Court has yet to hold that the right to pursue and obtain health and safety is a fundamental standalone right. We also sustain the trial court's denial of preliminary injunctive relief on plaintiffs' special legislation claim.

However, in the distinctive circumstances presented here, we vacate the court's premature disposition of the permanent injunction request and its termination of the lawsuit. We do so because the trial court, after discerning no fundamental right is at stake, applied a mistaken "rational basis" approach to plaintiffs' state equal protection challenge without conducting a fulsome balancing of the competing interests under the three-factor test prescribed by our State Supreme Court.

In addition, the trial court improvidently accepted at face value respondents' disputed economic contentions and the untested premise that ending the smoking exemption will inexorably result in drastic revenue and job

6

losses, without a development of a fuller record and detailed factual findings addressing plaintiffs' competing factual proofs and arguments.

Because the trial court used an improper equal protection methodology and resolved the critical factual dispute without an ample record, we remand the case for further proceedings.

On remand, the court shall allow the record to be developed and litigated to address the hotly contested projections of revenue loss, and for the court to make appropriate findings of fact concerning the reliability and credibility of the competing expert projections. Such findings are especially crucial to the ultimate disposition of plaintiffs' state equal protection arguments, with the health of thousands of casino employees and, perhaps, millions of dollars at stake. Upon making those findings, the court shall proceed to apply the three-part balancing required by state equal protection jurisprudence.

In ordering a remand, we stress that we are making no public policy determination and that we respect the vital role of the elected branches of our state government. We remand the matter to ensure that the independent analysis of equal protection principles under the New Jersey Constitution, which the Supreme Court has repeatedly declared to be distinct from the "tiered" methodology used for federal claims under the Equal Protection Clause, is

7

properly undertaken, and that competing factual assertions at the heart of that analysis are litigated and addressed with appropriate findings.

I.

The Causal Link of Tobacco Smoke to Health Hazards

The causal link between smoking and disease in active smokers has been recognized by federal health authorities for at least six decades. C. Everett Koop, Surgeon General, Preface to the Health Consequences of Involuntary Smoking: A Report of the Surgeon General ix (1986) ("1986 Surgeon General Report") ("By 1964, . . . a substantial body of evidence had accumulated upon which a judgment could be made that smoking was a cause of disease in active smokers").

By the 1980s, federal authorities acknowledged that secondhand smoke is itself a clear cause of chronic disease in nonsmokers. Ibid. ("It is now clear that disease risk due to the inhalation of tobacco smoke is not limited to the individual who is smoking, but can extend to those who inhale tobacco smoke emitted into the air.").

8

New Jersey's Legislative History of Smoking Restrictions

State legislatures first began restricting smoking in public places as a means of protecting the health of nonsmokers in the 1970s, reflecting emerging concerns about secondhand smoke. 1986 Surgeon General Report at 267.

New Jersey joined them in 1981. Citing a "conflict between the right of the smoker to smoke and the right of the nonsmoker to breathe clean air," our Legislature passed a trio of laws identifying specific locations where "the right of the nonsmoker to breathe clean air should supersede the right of the smoker to smoke."[1]

Those laws enacted in 1981 prohibited smoking tobacco products in public elevators,[2] in health care facilities and waiting rooms of the offices of persons licensed to practice the healing arts, except in certain designated

---

[1] See L. 1981, c. 318, §§ 1-6 (codified at N.J.S.A. 26:3D-1 to -6; repealed 2006); L. 1981, c. 319, §§ 1-8 (codified at N.J.S.A. 26:3D-7 to -14; repealed 2006); L. 1981, c. 320, §§ 1-8 (codified at N.J.S.A. 26:3D-15 to -22; repealed 2006).

[2] L. 1981, c. 318, § 3.

A-0057-24

smoking areas[3]; and in schools, colleges, universities, and professional training schools, except in smoking areas designated by the educational institution.[4]

The Legislature repeatedly updated and incrementally expanded smoking restrictions in the years that followed. In 1985, the Legislature enacted five additional bills to curb exposure to secondhand smoke.

First, New Jersey employers were required to designate nonsmoking areas in structurally enclosed places of employment of at least fifty workers—if smoking was permitted at all—but this requirement did not apply to locations frequented by members of the public.[5] Second, restaurants (but not bars) were "encourage[d]" to establish nonsmoking areas and required to post signage reflecting whether or not a nonsmoking area was offered.[6] Third, smoking was prohibited in large grocery stores.[7] Fourth, the Legislature addressed smoking on government property by generally prohibiting smoking in public meetings

---

[3] L. 1981, c. 319, § 3.

[4] L. 1981, c. 320, § 3.

[5] L. 1985, c. 184, §§ 1-9 (codified at N.J.S.A. 26:3D-23 to -31; repealed 2006).

[6] L. 1985, c. 185, §§ 1-7 (codified at N.J.S.A. 26:3E-7 to -13; repealed 2006).

[7] L. 1985, c. 186, §§ 1-6 (codified at N.J.S.A. 26:3D-32 to -37; repealed 2006).

and in offices open to the public along with libraries, indoor theatres, museums, lecture or concert halls, and gymnasiums (with exceptions for special occasions); requiring nonsmoking areas in certain restaurants in government buildings; and mandating nonsmoking areas in places of government employment (except the Legislature).[8] Government facilities used for sporting events or recreational activities like ice and roller skating were exempt from the bill's requirements.[9]

The final bill enacted in 1985 restricted smoking in a variety of indoor public places.[10] Smoking was prohibited in pharmacies, drug stores, and other places where drugs could be dispensed or where hearing aids could be sold.[11] Other indoor public places—defined to mean a structurally enclosed area generally accessible to the public such as theatres, gymnasiums, libraries, museums, concert halls, auditoriums, and similar facilities not covered by other

---

[8] L. 1985, c. 381, §§ 1-9 (codified at N.J.S.A. 26:3D-46 to -54; repealed 2006).

[9] Id. § 2(a).

[10] L. 1985, c. 318, §§ 1-8 (codified at N.J.S.A. 26:3D-38 to -45; repealed 2006).

[11] Id. § 3(b).

smoking laws—were required to establish designated nonsmoking areas.[12]  The 1985 Casino Exemption.

Most significantly for this case, however, the 1985 bill's definition of public places explicitly excluded "[r]ace track facilities, casinos . . . , facilities used for the holding of boxing and wrestling exhibitions or performances, football, baseball, and other sporting event facilities, bowling alleys, dance halls, ice and roller skating rinks and other establishments providing ambulatory recreation."[13]  The Legislature modestly expanded upon these restrictions on smoking in public places in the two decades that followed, including by enacting a 1998 law to prohibit smoking in child care centers.[14]

New Jersey Smoke-Free Air Act of 2006

Enacted on January 15, 2006, the New Jersey Smoke-Free Air Act effected a change of the State's past policy on indoor smoking.  See L. 2005, c. 383, §§ 1-10 (codified as amended at N.J.S.A. 26:3D-55 to -64) ("the Smoke-Free Air Act").

---

[12]  Id. §§ 2(a), 3(a).

[13]  Id. § 2(a) (emphasis added).

[14]  L. 1998, c. 35, (repealed in part 2006).

A-0057-24

Finding that "tobacco is the leading cause of preventable disease and death in the State and the nation," that "tobacco smoke constitutes a substantial health hazard to the nonsmoking majority of the public," and that "the separation of smoking and nonsmoking areas in indoor public places and workplaces [as mandated in the 1980s] does not eliminate the hazard to nonsmokers if these areas share a common ventilation system," the Legislature declared in the Smoke-Free Air Act that "subject to certain specified exceptions," it is clearly in the public interest to prohibit smoking in all enclosed indoor places of public access and workplaces. Id. § 2 (codified as amended at N.J.S.A. 26:3D-56(f)).

The Smoke-Free Air Act repealed the prior legislation imposing piecemeal regulations on smoking in designated places, id. § 2, and replaced those laws with a general prohibition on smoking in any indoor public place or workplace, "except as otherwise provided" in the Act, and at elementary and secondary schools, including both indoor and outdoor areas, id. § 4 (codified as amended at N.J.S.A. 26:3D-58).

"Indoor public place" is defined in the statute to mean "a structurally enclosed place of business, commerce or other service-related activity, whether publicly or privately owned or operated on a for-profit or nonprofit basis, which is generally accessible to the public[.]" Id. § 3 (codified as amended at N.J.S.A.

13

26:3D-57). The definition explicitly includes, but is not limited to, a list of select indoor public places, including many that were specifically addressed in prior legislation on smoking in designated places. Ibid. "Workplace" is defined to mean "a structurally enclosed location or portion thereof at which a person performs any type of service or labor." Ibid.

The Smoke-Free Air Act includes several exemptions. See id. §§ 5–6 (codified as amended at N.J.S.A. 26:3D-59 to -60). By its terms, the statute does not apply to certain cigar bars or lounges; tobacco retail establishments and any area a tobacco retail establishment provides for the purposes of smoking; and certain other tobacco businesses. Id. § 5(a)-(c). Private homes, private residences, and private automobiles are explicitly exempt to the extent that the statute might otherwise apply (e.g., a private residence on the grounds of a school). Id. § 5(d). In addition, hotels, motels, and lodging establishments are permitted to allow smoking in up to twenty percent of their guest rooms. Id. § 6(a).

Section 3D-59(e) of the Smoke-Free Air Act (the Casino Exemption)

Finally, and directly pertinent here, in a provision codified at N.J.S.A. 26:3D-59(e) ("Section 3D-59(e)"), the Smoke-Free Air Act specifies that its provisions do not apply to "the area within the perimeter of":

(1) any casino as defined in section 6 of P.L.1977, c.110 (C.5:12-6) approved by the Casino Control Commission that contains at least 150 stand-alone slot machines, 10 table games, or some combination thereof approved by the commission, which machines and games are available to the public for wagering; and

(2) any casino simulcasting facility approved by the Casino Control Commission pursuant to section 4 of P.L.1992, c.19 (C.5:12-194) that contains a simulcast counter and dedicated seating for at least 50 simulcast patrons or a simulcast operation and at least 10 table games, which simulcast facilities and games are available to the public for wagering.

[Id. § 5(e) (emphasis added).]

Section 3D-59(e) of the Smoke-Free Air Act was the subject of explicit legislative debate and amendment. As introduced, the Senate bill that eventually became the Smoke-Free Air Act would have more broadly exempted from the smoking prohibition any casino, any casino simulcasting facility, and any bar located in a casino or simulcasting facility. See S. 1926 (2004). However, in the Senate Health, Human Services and Senior Citizens Committee, the bill was amended to eliminate that exemption entirely, along with another exemption that covered social and fraternal organizations.[15]

---

[15] See S. Comm. on Health, Human Servs. & Senior Citizens, Statement to S. 1926 (Mar. 14, 2005).

Before passage, the bill was further amended on the floor of the Senate to include the narrower casino-related exemption contained in the enacted version of the Act. See S. 1926 (2005). An accompanying statement indicated that the purpose of this amendment, with its reference to "the area within the perimeter of a casino and simulcasting facility," was "to exempt only those areas in a casino and simulcasting facility that are completely surrounded by the applicable wagering area."[16]

Other New Jersey Public Health Strategies

New Jersey has deployed a vast array of other strategies to address the health risks of tobacco smoking. For example, the State prohibits tobacco sales to young people and in 2017 increased the minimum age for purchase to twenty-one. P.L.2017, c.118 (raising the minimum age for purchase and sale of tobacco products and electronic smoking devices from nineteen to twenty-one). Legislation that set a minimum age to purchase tobacco products dates back to the nineteenth century.[17]

---

[16] See Statement to S. 1926, (2005) (statement of Sen. Adler).

[17] See Dorie E. Apollonio & Stanton A. Glantz, Minimum Ages of Legal Access for Tobacco in the United States From 1863 to 2015, 106 Am. J. Pub. Health 1200, 1201 (2016) (noting that New Jersey in 1883 set the minimum age of legal access at sixteen).

16

Sales of tobacco products to individuals of legal age are regulated and taxed, in part to deter smoking. N.J.S.A. 54:40A-1 to -66 (Cigarette Tax Act with supplements); N.J.S.A. 54:40B-1 to -14 (Tobacco and Vapor Products Act). The State also funds public education on the health risks of smoking and resources for smokers who want to quit. N.J. Dep't of Health, Off. of Tobacco Control & Prevention, https://www.nj.gov/health/fhs/tobacco (last visited Jan. 13, 2026); New Jersey Quitline, https://www.njquitline.org (last visited Jan. 13, 2026).

Executive Orders During the COVID-19 Pandemic Imposing A Temporary Ban on Smoking in Casinos

By Executive Order, Governor Murphy banned smoking in casinos during the COVID-19 pandemic in June 2020. Exec. Order No. 158, 52 N.J.R. 1458(a) (June 29, 2020). The Governor revoked that Executive Order two months later, on September 1, 2020, again allowing smoking in casinos. Exec. Order No. 183, 52 N.J.R. 1714(b) (September 1, 2020). However, due to protests from health and worker advocates, three days later, on September 4, 2020, Governor Murphy again banned smoking in casinos.[18] That interim ban remained in effect for nine

---

[18] At the time, the Governor stated "we're going to switch a modest gear, that we will take administrative action to prohibit smoking in indoor casinos. We have looked closely at the science and agree with the experts who have

17

months until June 4, 2021, when the Governor issued a superseding Executive Order generally ending the COVID-19 public health emergency and lifting most of the executive orders relating to the pandemic. The June 2021 order had the effect of reinstating the casino exemption and allowing smoking to resume. Exec. Order No. 244, 53 N.J.R. 1131(a) (June 4, 2021).

Municipal Ordinances

The municipality of Atlantic City itself has taken steps to restrict smoking in casinos, pursuant to its authority under section 9 of the Smoke-Free Air Act, N.J.S.A. 26:3D-63. In 2007, the City enacted an ordinance that limited smoking in casinos and casino simulcasting facilities to 25% of the area within the perimeter where smoking was permitted under the Act itself. See Atlantic City, N.J. Ordinance No. 86 (2007). The following year, the City went further and banned smoking in all employee-staffed portions of the casino floor effective October 15, 2008, while also limiting smoking in casinos to non-staffed, separately exhausted, and enclosed smoking lounges. See Atlantic City, N.J. Ordinance No. 27 (2008).

―――――――――――――

concluded that allowing smoking is too big a risk to take." Governor Phil Murphy, Coronavirus Press Briefing (Sept. 4, 2020).

Shortly after that municipal ban went into effect, Atlantic City reconsidered it, because of economic concerns that banning smoking on the casino floor "would likely cause a significant, immediate and further decline in the Atlantic City casino industry."  See City of Atlantic City Ordinance No. 95 (approved Oct. 27, 2008; effective November 16, 2008).  Therefore, the City readopted its previous policy limiting smoking to 25% of the wagering floor. The City also required local officials to annually review the policy to assess "whether the factors then impacting the general welfare of Atlantic City residents and the Atlantic City casino industry and the employment, development, competitive and other economic conditions which affect them warrant[ed]" a smoking ban.  Ibid. (codified at Atlantic City, N.J. Municipal Code §§ 221-6A(6) and 221-6B).  The municipal ban has not been reinstated since.

Proposed, But Not Enacted, Post-2006 Legislation

Legislation has been introduced in every session since 2006 to eliminate or further limit the Smoke-Free Air Act's casino exemption.[19]  None of those bills have been enacted into law, including the recently completed session.

---

[19]  S. 1493/A. 2143; S2651 (2024-2025); S. 264/A. 2151 (2022-2023); S. 1878/A. 4541 (2020-2021); S. 1237 (2018-2019); S. 1517/A. 2936 (2016-2017);

Generally speaking, supporters of the bills have emphasized the health impacts of smoking, including impacts on casino workers. Opponents generally have emphasized the anticipated economic impacts of a complete ban on smoking in casinos, including predicted significant revenue losses for the casino industry and ancillary businesses as well as the job losses they expect to follow, particularly considering the growing participation in online gaming.

## II.

<u>This Lawsuit to Invalidate the Casino Exemption on State Constitutional Grounds and for Injunctive Relief</u>

Plaintiffs are the UAW (International United Automobile Aerospace and Agricultural Implement Workers of America), Region 9 of the UAW, and C.E.A.S.E. N.J. (abbreviated for "Casino Employees Against Smoking's (Harmful) Effects"), who collectively represent an estimated subset of roughly 6,000 New Jersey casino workers.

Plaintiffs filed a verified complaint and Order to Show Cause ("OTSC") on April 5, 2024, in the Chancery Division, seeking both preliminary and permanent injunctive relief that would void Section 3D-59(e).

---

S. 1639/A. 2133 (2014-2015); S. 1795/A. 343 (2012-2013); S. 423/A. 1062 (2010-2011); S. 236/A. 806 (2008-2009); S. 1089/A. 2067 (2006-2007).

In their three-count complaint, plaintiffs, alleging their members are or were exposed to secondhand smoke while working as New Jersey casino employees, asserted claims under the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 to -2, alleging that Section 3D-59(e) violates the State Constitution because it: violates a constitutional "right to safety" (Count One); the statute constitutes an unconstitutional "special law" (Count Two); and the statute denies plaintiffs Equal Protection under the State Constitution (Count Three).

The Casino Association and nine other non-UAW labor unions representing thousands of casino workers (together, "intervenors") intervened to defend Section 3D-59(e). Defendants opposed the OTSC and moved to dismiss the verified complaint, as did the intervenors.

<u>The Trial Court's Decision Rejecting Plaintiff's Constitutional Arguments and Dismissing the Lawsuit with Prejudice</u>

Following argument but without hearing any testimony, the trial court denied injunctive relief and granted the motions to dismiss. It set forth its reasoning in an August 30, 2024 written opinion.

As a threshold matter, the court did find that plaintiffs had made an adequate showing in the OTSC of anticipated irreparable harm:

> The first prong under <u>Crowe</u> requires a showing of irreparable harm. In the instant matter, irreparable harm may result. The effects of secondhand smoke are not disputed, and research has shown that exposure to secondhand smoke may lead to numerous health hazards. In the most extreme circumstances exposure to secondhand smoke may lead to lung cancer and premature death. (www.cdc.gov/tobacco/secondhand-smoke/health.html). Under the circumstances where an individual does develop a serious health issue from exposure to secondhand smoke, monetary damages are not an adequate remedy. Therefore, irreparable harm may result if smoking continues in casinos.

Substantively, however, the court found that each of plaintiffs' claims failed as a matter of law, and that they had not presented the required preliminary showing of a reasonable likelihood of success on the merits.

As to Count One, the "right to safety" claim, the court concluded that even a "generous reading" of the verified complaint "does not establish a cause of action," because "no case law, statute or otherwise" supports the existence of a standalone constitutional right requiring the Legislature to affirmatively pursue specific health and safety measures that must outweigh countervailing interests. The court observed that "[p]laintiffs cite to no legal authority of any kind to support their argument that safety is a stand-alone constitutional right."

Turning to the "special legislation" claim, the court analyzed the case law, explained the legal requirements to strike down a statute on that basis, and held

22

that the ultimate question on that issue is whether a legislative distinction "can be said to rest upon some rational basis." The trial court concluded that movants had demonstrated such a rational basis because, "[d]uring oral argument and [in] the briefs, [d]efendants supplied ample support for a rational basis for the Smoke-Free Air Act casino exemption, namely, the plentiful economic benefits that the casinos provide to the state of New Jersey through tax revenues to support other programs."[20] (Emphasis added).

The trial court further reasoned it was rational to treat casinos differently because our State Constitution contains express provisions directly related to Atlantic City and to casino operations, and that "Atlantic City's special constitutional status allows the [L]egislature to create classifications in law where the classification is directly connected to the operation of casinos in Atlantic City."

Finally—and most pertinent to our analysis in Part IV(C), infra—the trial court dismissed plaintiffs' state constitutional equal protection claim, declaring that neither "the New Jersey Constitution nor any case law supports [p]laintiffs'

---

[20] Pertinent to that conclusion, State defendants had noted at oral argument that the 2024 proposed New Jersey budget included over $526 million to be spent on such programs from the Casino Revenue Fund. See State of New Jersey, "Budget in Brief,"https://www.nj.gov/treasury/omb/publications/24bib/BIB.pdf (last visited Jan. 13, 2026) at 85.

argument" that the statute affected a fundamental constitutional right. To the extent that plaintiffs have an alleged fundamental right to "pursue and obtain" safety, the trial court found the casino exemption did not violate such a right because the risks of exposure to secondhand smoke were known; smoking has never been banned in casinos except for a short time during COVID-19; the statute's exemptions only affect a few industries; and the Act does not hinder or affect a person's ability to seek work in a smoke- free environment.

Notably, the court did not explicitly balance the interests supporting and weighing against the statute's classification. Instead, as we will discuss in more depth in Part IV(C), the court deemed the equal protection test of the New Jersey Constitution to be the same as a "rational basis" test used in federal Equal Protection Clause cases that do not involve fundamental rights or suspect classes. Applying that deferential rational-basis test, as in its evaluation of plaintiffs' special legislation challenge, the court found the casino exemption valid.

The court accordingly denied plaintiffs' request for injunctive relief, not distinguishing in its order or opinion between a preliminary or permanent injunction. The court terminated the lawsuit with finality, granting the motions to dismiss the case with prejudice.

24

<u>This Appeal</u>

Plaintiffs appealed, challenging the aspects of the trial court's rulings rejecting their constitutional challenges to Section 3D-59(e). They applied to this court for permission to file a motion for emergent relief, which was denied. The Supreme Court likewise denied a similar emergent application.

During the appellate briefing, we permitted the American Civil Liberties Union of New Jersey ("ACLU-NJ") and a group known as the Americans for Nonsmokers' Rights ("ANR") to, respectively, participate in this matter as amicus curiae. They are supportive of plaintiffs' effort to reverse the trial court's ruling.[21] Intervenors, meanwhile, join with the State defendants[22] (collectively, "respondents") in opposing the appeal.

### III.

The issues were presented to the trial court in the context of plaintiffs' OTSC seeking preliminary (or temporary) and, ultimately, permanent injunctive relief to restrain the continued enforcement of the casino exemption. The

---

[21] Notably, the ACLU-NJ limited its amicus brief to arguing that the court erred in its state equal protection analysis and chose not to brief the other constitutional claims.

[22] At the appellate oral argument, the Deputy Attorney General clarified that, as a policy matter, (now former) Governor Murphy was amenable to signing into law the pending legislation if the bills passed both Houses.

A-0057-24

pertinent standards to obtain an injunction under New Jersey law are well established.

Preliminary (or "temporary") injunctive relief is appropriate when the moving party establishes: (1) a reasonable probability of success on the merits; (2) irreparable harm; (3) a showing that, on balance, the harm to the moving party is greater than the harm to the party to be restrained; and (4) the public interest will not be harmed. In re Newark, 469 N.J. Super. 366, 387 (App. Div. 2021) (citing Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982); Brown v. City of Paterson, 424 N.J. Super. 176, 183 (App. Div. 2012)). See also Garden State Equal. v. Dow, 216 N.J. 314, 320-21 (2013) (further elaborating the factors required to support preliminary injunctive relief). These familiar components to the multi-part test are known as the "Crowe factors," and were referred to as such in the trial court's decision.

When applying these four factors, our case law often has been especially focused on the last one: the public interest. "[W]e have recognized the important role the public interest plays when [it is] implicated" and "have held 'that courts, in the exercise of their equitable powers, may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are

involved.'" Waste Mgmt. of N.J., Inc. v. Morris Cnty. Mun. Utils. Auth., 433 N.J. Super. 445, 454 (App. Div. 2013) (quoting Waste Mgmt. of N.J., Inc. v. Union Cnty. Utils. Auth., 399 N.J. Super. 508, 520-21 (App. Div. 2008)). See also Brown, 424 N.J. Super. at 183 (recognizing the importance of the public interest in balancing the Crowe factors).

Here, plaintiffs and the amici assert a public interest in protecting casino workers from the health hazards of secondhand smoke, whereas respondents assert a competing public interest in maintaining revenues, tax proceeds, and jobs generated from on-site casino gambling. As the trial court correctly recognized, this is manifestly a "public interest" case. Hence, the court should be willing to "go much farther both to give and withhold relief in furtherance of the public interest" than it might in a battle of private concerns. Waste Mgmt. v. Morris Cnty., 433 N.J. Super. at 454.

Typically, a trial court considers an application for preliminary injunction at the early stages of a case—before discovery is completed and the record and legal issues are well developed. Among other things, the court fielding a preliminary injunctive application must make a tentative prediction about how the lawsuit will eventually be decided. The burden is on the applicant to establish at least a reasonable probability of success. Crowe, 90 N.J. at 177.

27

By contrast, the grant or denial of a permanent injunction at the end of a case, after the factual record and the legal arguments have been litigated, demands a deeper assessment. It is well established that "[a] trial court's determination whether to grant or deny an application for a preliminary injunction involves a different analysis than whether to grant a permanent injunction at the conclusion of the case." Rinaldo v. RLR Inv., Inc., 387 N.J. Super. 387, 397-99 (App. Div. 2006).

Judge Skillman aptly explained this key preliminary/permanent difference in Rinaldo:

> In considering an application for a preliminary injunction, the court must determine whether the applicant has made "a preliminary showing of a reasonable probability of ultimate success on the merits." Crowe v. DeGioia, 90 N.J. at 133. In most cases, this involves a prediction of the probable outcome of the case based solely on documentary proofs, including affidavits containing conflicting factual allegations. Id. at 133-34. If there is a dispute as to whether the harm the applicant alleges can be adequately addressed by monetary damages, the court must determine not only the likelihood that the applicant will establish the other party's liability but also the need for injunctive relief to redress the harm. Id. at 132-33.
>
> In contrast, the determination whether to grant a permanent injunction at the conclusion of the case does not involve a prediction as to the outcome of future proceedings. Instead, at that stage of the case, the court

> must make findings of fact based on the evidence presented at trial and then determine whether the applicant has established the liability of the other party, the need for injunctive relief, and the appropriateness of such relief on a balancing of equities. See Verna v. The Links at Valleybrook Neighborhood Ass'n, 371 N.J. Super. 77, 89 (App. Div. 2004); Sheppard v. Twp. of Frankford, 261 N.J. Super. 5, 9-11 (App. Div. 1992); Restatement (Second) of Torts § 936 (1979).
>
> [Id. at 397 (emphasis added).]

Judge Skillman added, again stressing the importance of a "complete record" developed "at trial" in cases where there are factual disputes that affect the grant or denial of final injunctive relief:

> In some cases, a trial court may be able to determine in ruling on an application for a preliminary injunction that the applicant would not be entitled to equitable relief even if he or she were to establish the other party's liability. However, if the applicant's ultimate entitlement to injunctive relief turns on contested issues of fact, this determination can only be made after the development of a complete record at trial.
>
> [Id. at 397-98 (emphasis added).]

See also Paternoster v. Shuster, 296 N.J. Super. 544, 556 (App. Div. 1997) (noting that in considering whether to issue or deny a permanent injunction, the court must engage in a "qualitative" balancing of rights (citing Sheppard v. Twp. of Frankford, 261 N.J. Super. 5, 10 (App. Div. 1992)), as well as "a sensitive

evaluation of the entire situation" (citing Trans Am. Trucking Servs., Inc. v. Ruane, 273 N.J. Super. 130, 133 (App. Div. 1994))).

We will return to these injunctive principles in our discussion of the merits that now follows in Part IV.

IV.

As we plunge into the constitutional analysis, we must bear in mind the general maxim that "a statute is presumed to be constitutional and that a court should exercise sparingly the power to declare a statute unconstitutional." Jordan v. Horsemen's Benevolent & Protective Ass'n, 90 N.J. 422, 433 (1982) (citations omitted). Every statute contains "a presumption of validity." State v. Lenihan, 219 N.J. 251, 266 (2014). That presumption may, nevertheless, be rebutted and overcome when it is warranted to vindicate constitutional rights or to remedy constitutional wrongs. See, e.g. Lewis v. Harris, 188 N.J. 415 (2006) (ruling that the State's marriage laws, although presumptively valid, needed to be struck down in part because they were proven to be unconstitutional in their administration).

With that presumption in mind, we turn to the substance of the state constitutional arguments that plaintiffs have levied against the casino smoking exemption. We choose to begin our analysis with plaintiffs' state equal

protection challenge, as it is the most potentially viable of their constitutional claims, and, as we have noted above, the one singled out in the ACLU-NJ's amicus brief. As we will see, the equal protection analysis is intertwined to some extent with plaintiffs' other arguments concerning the "safety" language in Article I, Paragraph 1, and the prohibition on "special" legislation in Article IV, Section VII, Paragraph 7.

A.

The constitutional principle of equal protection in our State derives from Article I, Paragraph 1 of the New Jersey Constitution, which declares:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
>
> [N.J. Const. art. I, ¶ 1.]

Article I, which originated in the 1844 New Jersey Constitution, does not contain the term "equal protection." However, "it is well settled law that the expansive language of that provision" is the source of the state constitutional guarantee. Sojourner A. v. N.J. Dep't of Human Servs., 177 N.J. 318, 332 (2003) (quoting Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 629 (2000)).

31

Our Supreme Court has repeatedly made clear that the meaning and application of this New Jersey state constitutional right to equal protection differs from the federal Equal Protection Clause of the Fourteenth Amendment, and how the United States Supreme Court has interpreted that federal analog.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," meaning that all persons similarly situated should be treated alike within statutory classifications. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyer v. Doe, 457 U.S. 202, 216 (1982)). Legislation is generally presumed to be valid under the Equal Protection Clause if a statute's classification is "rationally related to a legitimate state interest." Id. at 440 (citing Schweiker v. Wilson, 450 U.S. 221, 230 (1981)).

However, that federal "rational basis" approach is qualified by what are known as "tiered" levels of scrutiny. Under the Equal Protection Clause, if the classification affects what the United States Supreme Court has proclaimed to be a "fundamental right," or if the law at issue invidiously harms a "suspect class" of persons, then a higher level of judicial "strict scrutiny" applies. Bush v. Gore, 531 U.S. 98 (2005) (applying strict scrutiny to classifications that infringe on the fundamental right to vote); see also Johnson v. California, 543

32

U.S. 499 (2005) (applying strict scrutiny to an invidious policy of racially segregating prison cells). As a further nuance of the federal tiers, for some classifications such as illegitimacy and gender, the United States Supreme Court has adopted a test of "intermediate scrutiny." Matthews v. Lucas, 427 U.S. 495 (1976) (applying intermediate scrutiny classifications based on illegitimacy); see also United States v. Virginia, 518 U.S. 515 (1996) (applying intermediate scrutiny to require a public military academy to accept women).

Our New Jersey Supreme Court has eschewed the federal Equal Protection "tiered" approach in construing the analog state constitutional right. In several instances, our courts have construed the New Jersey state constitutional principles of equal protection more expansively than their federal counterpart. See, e.g., Right to Choose v. Byrne, 91 N.J. 287, 292-93 (1982) (regarding the termination of funding for medically necessary abortions); see also Planned Parenthood, 165 N.J. at 643 (invalidating certain parental notification laws for abortions); State v. Gilmore, 103 N.J. 508, 522-23 (1986) (invalidating the discriminatory use of peremptory challenges in jury selection). "Although conceptually similar, the right under the State Constitution can in some situations be broader than the right conferred by the Equal Protection Clause." Doe v. Poritz, 142 N.J. 1, 93 (1995).

A-0057-24

This more expansive approach for equal protection is in keeping with our robust tradition of at times affording greater independent constitutional protection to persons in this State and not analyzing state constitutional claims in "lockstep" with federal precedents. See, e.g., Usachenok v. Dep't of the Treasury, 257 N.J. 184, 195-96 (2024) (free speech of employees); State v. Zuber, 227 N.J. 422, 438 (2017) (sentencing of young offenders to lengthy, cruel and unusual, custodial terms); State v. Hempele, 120 N.J. 182, 195 (1990) (warrantless search and seizure of curbside trash).

New Jersey's Three-Factor Equal Protection Balancing Test

The distinctive, more flexible New Jersey notion of equal protection was illuminated in the Supreme Court's 1985 seminal opinion in Greenberg v. Kimmelman, 99 N.J. 552, 567 (1985). The plaintiff in Greenberg, the wife of a Superior Court judge, obtained a license to work as a casino hotel employee but she was prevented from working there after the Legislature passed a conflicts-of-interest law precluding such employment by immediate family members of judges and other State officers. Id. at 559-60. She sued to invalidate the employment ban under the equal protection and due process principles of the federal and state constitutions. Id. at 561-62. Among other things, she argued the ban unduly infringed on her rights to employment opportunities, to marry,

and to enjoy familial associations.  Id. at 569-70.  She further argued the classification had an impermissible disproportionate effect on female spouses because (at that time) about 95% of New Jersey judges were men.  Id. at 579.

Analyzing Greenberg's state equal protection challenge, the Court noted that in Robinson v. Cahill, 62 N.J. 473, 491-92 (1973), it had begun to develop an independent analysis of state constitutional rights under Article I, Paragraph 1, one that "rejected two-tiered equal protection analysis . . . and employed a balancing test in analyzing claims under the state constitution."  Greenberg, 99 N.J. at 567 (quoting Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp., 80 N.J. 6, 43 (1976)).  The Court in Greenberg reinforced that balancing test, noting the wisdom of "developing an interpretation of the New Jersey Constitution that is not irrevocably bound by federal analysis," and "avoid[ing] the necessity of adjusting our construction of the state constitution to accommodate every change in federal analysis of the United States Constitution."  Id. at 568.

Of special pertinence here, the New Jersey equal protection balancing test considers three aspects:  (1) "the nature of the affected right"; (2) "the extent to which the governmental restriction intrudes upon it"; and (3) "the public need for the restriction."  Ibid. (citing Right to Choose, 91 N.J. at 308-09).  The Court

A-0057-24

applied that test to Greenberg's circumstances and concluded that "the state interest in maintaining confidence in the integrity of the judiciary . . . <u>outweighs the slight imposition upon plaintiff's rights</u>." <u>Id.</u> at 579 (emphasis added).[23]

Years later, the Court applied the balancing test in <u>Lewis v. Harris</u>, 188 N.J. at 443, this time concluding that rights advocated by the plaintiffs—even though they were not "fundamental" in nature—outweighed the state's interests in laws that prevented same-sex couples from having the same benefits and obligations as married couples. To remedy the state equal protection violation, the Court directed the Legislature to "either amend the marriage statutes to include same-sex couples or enact a parallel statutory structure by another name, in which same-sex couples would not only enjoy the rights and benefits, but also bear the burdens and obligations of civil marriage." <u>Id.</u> at 463.

---

[23] We observe that, unlike the personal individual interests of the judge's spouse in <u>Greenberg</u> in obtaining employment in a casino position, the present case distinguishably involves the continued employment and workplace conditions of thousands of casino workers. We therefore do not regard the Court's rejection of Greenberg's individual claim as dispositive—either way—of the present case. One can take judicial notice that casinos are a major employer in the South Jersey labor market, and that the ability of thousands of casino workers to find alternative and healthy employment in the region may be substantially affected by the outcome of this case. In addition, the offsetting economic and tax revenue interests presented here by respondents were not involved as governmental interests in <u>Greenberg</u>.

The plaintiffs in <u>Lewis</u>, seven pairs of same-sex couples, argued that the right to marry as same-sex couples should be deemed "fundamental" in nature under the New Jersey Constitution. <u>Id.</u> at 433-42. In making that argument, those plaintiffs, as here, declined to claim a deprivation of rights under the federal Equal Protection Clause and rested their arguments exclusively on the state constitution. Although the Court in <u>Lewis</u> recognized changes in societal attitudes towards gays and lesbians since the marriage laws were enacted, the Court could not "find that a right to same-sex marriage is so deeply rooted in the traditions, history, and conscience of the people of this State that it makes it a fundamental right." <u>Id.</u> at 441.

Nevertheless, despite the absence of a fundamental right, the Court in <u>Lewis</u> concluded—applying the factors of the New Jersey equal protection balancing test—that the State's arguments for maintaining the existing statutory scheme were outweighed by the opposing (albeit non-fundamental) interests advocated by the plaintiffs. <u>Id.</u> at 442-57.

The Court found in <u>Lewis</u> as to prong one that same-sex couples have "<u>a strong interest</u> in equality of treatment relative to comparable heterosexual couples." <u>Id.</u> at 448 (emphasis added). Second, on prong two, the Court found the intrusion upon that strong interest by the State was well evidenced, despite

37

efforts to bridge the inequality gap through domestic partnership laws.  Id. at 448-50.  Of particular relevance here, the Court noted, among other things, that same-sex couples certified as domestic partners received "fewer workplace protections than married couples."  Id. at 450 (emphasis added).  Turning to prong three, the Court concluded that "the public need" for denying committed same-sex partners the full benefits that flow from marriage had not been shown. Id. at 451-53.

We recognize that, in analyzing the third "public need" prong in Lewis, the Court ultimately concluded the State's asserted need for the existing classification "bears no substantial relationship to a legitimate governmental purpose."  Id. at 458.  However, the Court reached that final determination only after an in-depth consideration of the evidence of disparity before it, and a careful weighing of the merits of the competing arguments.  The Court required more of the State than the mere assertion of a conceivable rational basis to support the statutory scheme; it critically evaluated the State's assertion of rationality and did not accept it at face value.

Having analyzed the plaintiffs' state constitutional claim in this multi-faceted, nuanced manner, the Court in Lewis declared the existing state laws violated the equal protection guarantee of Article I, Paragraph 1, and directed

A-0057-24

the Legislature to fashion a remedy that would eliminate the inequality of treatment. Id. at 457-58. The Legislature proceeded to enact civil union laws, which were subsequently found inadequate[24] and thereafter supplanted by the United States Supreme Court's recognition of a federal constitutional right to same-sex marriage.[25]

The three-part balancing test has remained unaltered by our Supreme Court as the proper modality for evaluating New Jersey equal protection claims. To be sure, as the Court has recognized, in many instances, the modality entails looking at the same facts and interests and produces the same outcomes as the federal "tiered" equal protection test. Sojourner, 177 N.J. at 333. Nonetheless, the balancing test can potentially lead to an invalidation of a statutory classification even where no fundamental right is infringed and the State contends the classification rests on a "rational basis." As state constitutional scholars have noted, "[u]nder this approach, a right need not be labeled 'fundamental' or a classification deemed 'suspect' to trigger searching judicial review." Robert F. Williams & Ronald K. Chen, The New Jersey State Constitution 58 (3d ed. 2023).

---

[24] Garden State Equality, 216 N.J. at 330.

[25] Obergefell v. Hodges, 576 U.S. 644, 681 (2015).

A-0057-24

We now undertake that "searching judicial review."

B.

Although, for the reasons we have stated above, it is not essential for plaintiffs to show their interests amount to a constitutionally recognized fundamental right, the presence of such a right can strengthen their arguments to prevail under the three-part balancing test.

Plaintiffs contend they have such fundamental rights based on the text of Article I, Paragraph 1, which we have already quoted above. They point to the following underscored words:

> All persons are by nature free and independent, and have <u>certain natural and unalienable rights, among which are those of</u> enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of <u>pursuing and obtaining safety and happiness</u>.
>
> [N.J. Const. art. I, ¶ 1 (emphasis added).]

Plaintiffs allege the trial court erred by concluding that case law does not recognize a stand-alone right to pursue and obtain safety under this constitutional language, and by faulting plaintiffs for not citing precedent supporting such a right.

Plaintiffs note our Supreme Court has specifically acknowledged the "high priority" granted to health preservation, noting that the right to personal

40

security encompasses the "preservation of a [person's] health from such practices as may prejudice or annoy it."  Right to Choose, 91 N.J. at 304. Plaintiffs argue the trial court improperly diminished this right by interpreting the constitutional text as providing only a right to "pursue" safety, rather than to also "obtain" it.

Plaintiffs also highlight the statutory and common law obligation to maintain a safe workplace, which is well established in New Jersey.  For example, in this regard, N.J.S.A. 34:6A-3, mandates every employer to "furnish a place of employment which shall be reasonably safe and healthful for employees," and requires installation and maintenance of protective devices and enforcement of methods that mitigate substantial injury risks.  Our case law has regarded such workplace safety as a strong public policy in the state.  See Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 445 (App. Div. 1988). Older case law in our State further recognizes that employees generally are entitled to a work environment that is free from unsafe conditions.[26]

---

[26] See, e.g., Canonico v. Celanese Corp. of Am., 11 N.J. Super. 445 (App. Div. 1951); Shimp v. N.J. Bell Tel. Co., 145 N.J. Super. 516 (Ch. Div. 1976); McDonald v. Standard Oil Co., 69 N.J.L. 445 (E. & A. 1903); Burns v. Delaware and Atl. Tel. and Tel. Co., 70 N.J.L. 745 (E. & A. 1904); Clayton v. Ainsworth, 122 N.J.L. 160 (E. & A. 1939); Davis v. N.J. Zinc Co., 116 N.J.L. 103 (E. & A. 1936).

A-0057-24

Plaintiffs further argue that, by excluding casino workers from the protections of the Smoke-Free Air Act, the State has created a specific danger to their health. They assert this exclusion triggers what is known as the state-created danger doctrine, which prohibits the State from taking affirmative steps that endanger residents' health or safety. Gormley v. Wood-El, 218 N.J. 72, 102-03 (2014) (delineating four factors for imposing liability upon the State for creating such a danger: (1) foreseeable, direct harm; (2) culpable, conscience-shocking state action; (3) a special relationship identifying foreseeable victims; and (4) affirmative state acts creating or increasing vulnerability to danger). Such state-created dangers can be actionable even absent an employment relationship. Id. at 108-09.

Plaintiffs acknowledge they do not seek damages from the State, but rather a healthy workplace free from toxic smoke, as is guaranteed to other New Jersey workers. Stressing the Legislature's findings in the Smoke-Free Air Act of the serious health dangers of secondhand smoke, plaintiffs maintain the casino smoking exemption violates what they regard as an affirmative and fundamental right to pursue and obtain safety under Article I, Paragraph 1 of the Constitution.

On the other hand, respondents contend the trial court properly rejected the assertion that Section 3D-59(e) of the Smoke-Free Air Act violates a

42

constitutional "right to safety" under Article I, Paragraph 1. They argue the constitutional provision declares that individuals possess "natural and unalienable rights" to "pursue and obtain safety and happiness," but does not require the State itself to take affirmative steps to guarantee safety for its citizens. Respondents argue the language recognizes a principle of personal autonomy without imposing a general governmental obligation to actively provide for welfare.

In the few cases that have wrestled with the claim, courts thus far have declined to read Article I, Paragraph 1, as creating a freestanding duty for the State to furnish basic needs or protections. See, e.g., L.T. v. N.J. Dep't of Human Servs., Div. of Family Dev., 264 N.J. Super. 334, 340-42 (App. Div. 1993), rev'd on other grounds, 134 N.J. 304, 321 (1993) (denying an obligation of the State to finance social services such as government-funded housing); Franklin v. N.J. Dep't of Human Servs., 225 N.J. Super. 504, 522 (App. Div.1988), aff'd, 111 N.J. 1 (1988) (rejecting arguments to recognize a constitutional obligation of the State to provide shelter).

Respondents submit that plaintiffs' attempt to construe the Constitution's reference to safety as mandating a specific prohibition on casino smoking is an improper invitation for judicial intrusion into legislative policymaking,

43

especially since the provision lacks any limiting principle. If such a free-standing constitutional duty existed, respondents argue, the State would be compelled to address all known public health dangers, not just tobacco smoke, essentially requiring the adoption of broad welfare legislation, a position courts have rejected. Respondents further argue that the workplace safety statutes and case law cited by plaintiffs do not rise to the creation of an affirmative or fundamental constitutional right.

Furthermore, respondents contend the state-created danger doctrine does not support the recognition of a fundamental right to be free from secondhand smoke. They assert the doctrine applies only when a state actor "affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." Gormley, 218 N.J. at 101.

In the present case, the Legislature's adoption of the casino smoking exemption and its inaction on proposed changes do not amount to affirmative state action; rather, the continuation of the exemption entails policymaking discretion. Respondents maintain the State's role in leaving the choice to permit smoking in casinos to local decision-makers and casino employers is not tantamount to the State itself creating or increasing plaintiffs' vulnerability.

A-0057-24

Moreover, since casino smoking was permitted prior to the Smoke-Free Air Act, the exemption did not make casino workers more vulnerable than they were before the Act's passage.

Having thus canvassed the parties'[27] competing interpretations of the "safety" language within Article I, Paragraph 1, we respectfully decline in our limited role as an intermediate appellate court to create new constitutional precedent recognizing such a standalone right. See, e.g., Gottsleben v. Annese, 482 N.J. Super. 215 (App. Div. 2025) (recognizing the limited institutional role of the Appellate Division in declaring new legal principles, as contrasted with that of the Supreme Court); State v. Rodriguez, 459 N.J. Super. 13, 25 (App. Div. 2019) (similarly yielding to the Supreme Court in fashioning new constitutional principles). If such a sweeping right is recognized for the first time, it should be by the Supreme Court as the ultimate arbiter of our State Constitution.

We therefore leave undisturbed the trial court's ruling that such a fundamental right has yet to be recognized in our State. That particular claimed

---

[27] The briefs of the two amici do not advocate for the recognition of such a standalone constitutional fundamental right, as they are silent on the issue.

right is not "settled," and thus could not have supported a preliminary injunction on that basis. Crowe, 90 N.J. at 177.

C.

We now address the equal protection balancing test as it applies to this case, in a context in which a settled fundamental right is absent.

The trial court correctly recited the three-part balancing test at the outset of its equal protection discussion. Unfortunately, the court mistakenly failed to engage in a fulsome balancing of interests once it determined that no fundamental right was implicated. Instead, the court determined whether a "rational basis" exists to support the casino smoking exemption. The court's opinion identified the State's economic interests in maintaining revenues from casino gambling as such a "rational basis." But, as Greenberg, Lewis, and other case law instructs, identifying rational grounds that can support legislation is not the same thing as constitutionally balancing the competing factors, and comparing their relative weight.

In essence, the trial court engaged in a federal Equal Protection analysis, in which deferential "rational basis" review is applied if there is no fundamental right or invidious classification in play. As we have explained above, equal protection analysis under the New Jersey Constitution requires more than that.

46

The trial court reasoned that "because [p]laintiffs' . . . equal protection claim, <u>rests on</u> the validity of safety as a fundamental right[,] [p]laintiffs cannot establish they are likely to succeed on the merits of the equal protection claim" (emphasis added). The court added that "[b]ecause [p]laintiffs have not set forth any facts or arguments to show that <u>no rational basis exists</u> for the legislation, [they] are unable to show that they are likely to succeed on the merits . . . of their complaint." (Emphasis added).

In reaching its determination that the State provided a rational basis for the exemption, the trial court made a critical finding. As we noted above, it found that "[d]uring oral argument and on the briefs, [d]efendants supplied ample support for a rational basis for the Smoke-Free Air Act casino exemption, namely the plentiful economic benefits that the casinos provide to the state of New Jersey through tax revenues to support other programs."

The court did not, however, specify the evidence it was relying upon to make that crucial finding.[28] A central premise of that economic finding is that

---

[28] The court also found that the references to Atlantic City casino gambling in various provisions within the State Constitution warrant a heightened level of State interest in preserving the revenue stream from those casinos. See N.J. Const. art. IV, § VII, ¶ 2. We acknowledge those provisions are there and important, but do not regard them as authorizing the Legislature to exempt casinos from employment laws that generally apply to other employers in our

if the casino smoking exemption were nullified, the casinos, as respondents assert, would suffer a drastic reduction of patrons who enjoy smoking as they gamble, and a steep revenue loss of millions of dollars.

The Spectrum Study

Without citing it expressly, the court appears to have accepted at face value the "Spectrum Study" tendered to it by respondents, a 2021 report that forecasts a sharp decline in New Jersey casino revenues if smoking were eliminated. Among other things, the Spectrum Study asserts the following contentions:

- Smokers disproportionately patronize casinos, as only 13% of New Jersey residents are smokers but 21% of casino players are smokers.

- Casinos that attempted to implement smoking bans in Delaware (2003), Illinois (2008) and Louisiana (2015) experienced a loss in revenue at the time the ban was implemented, presumably as a direct result of the ban.

- If New Jersey casinos ban smoking, those casinos will lose their unique appeal to smokers and the percentage of smokers in casinos will match the overall demographics of smokers in New Jersey. The study relies in this regard on the opinions of casino industry workers, such as an "independent junket operator" who stated that smokers will play at a casino that restricts smoking but if another casino is equidistant, or slightly farther away, which allows smoking, then the smokers will choose the smoking casino.

state, such as the Law Against Discrimination, N.J.S.A. 10:5-1 to -50, or Wage and Hour, N.J.S.A. 34:11-34 to -56a43, and Wage Collection Laws, N.J.S.A. 34:11-57 to -67.2, just because compliance with those laws might make casino operations less profitable.

- Smokers provide a higher monetary value to casinos, as the win per unit ("WPU") of machines and games in the smoking sections of various casinos are consistently higher than the WPUs of machines and games in non-smoking sections, with one casino president stating that 50% of slot revenue was generated from the smoking section.

- A smoking ban would reduce the time that smokers spend on gaming machines because they will need to go outside to take smoke breaks. This time away from gambling could also result in patrons deciding to leave the casino entirely and cut their losses.

- Smokers provide casinos with a "smoker premium" of value added to the casino's revenues, the study estimates this premium ranges from 25% to 50%.

- In year one of a hypothetical smoking ban, smokers from neighboring states will be less likely to travel from jurisdictions such as New York and Pennsylvania to go to casinos in Atlantic City. Casinos will lose between 11.9% of the revenue from gaming, with a smoker premium of 50%, and 5% of revenue from gaming, assuming a lower smoker premium of 25%.

- Although some non-smokers might be more likely to patronize the casinos once they are smoke-free, that percentage is predicted to be extremely low, with only a 1.0-1.5% projected increase in play from non-smokers. Total revenue losses would still range from $23.1 million to $113.8 million, i.e., between 4.2% and 10.9%.

- As a result of this projected loss in casino revenue, tax revenues to the State of New Jersey will decrease by between $17.2 million and $44.6 million. Furthermore, 1,021 to 2,512 jobs will be lost.

Plaintiffs strenuously dispute the reliability of these economic forecasts in the Spectrum Study. For one thing, they note it was a study financed by the casino industry and not a governmental report. Plaintiffs argue the study greatly exaggerates the loss of casino revenues that would ensue if the casinos became

49

A-0057-24

smoke-free, and that it also underestimates the level of offsetting revenue that would be generated by new patrons who will be attracted to smoke-free casino premises. They also point out that smoke-free casinos have opened, and more are about to open, in neighboring states, with actual or anticipated commercial success.

The C3 Study

Furthermore, plaintiffs and amicus ANR point to a competing 2022 study (the "C3 Study"), the "Evaluation of Post-Pandemic Non-Smoking Trends in US Casinos," conducted by the Gaming Casino Consultants Consortium ("C3"), a consortium of consultants in the gaming and hospitality industry.[29] According to amicus ANR, the consortium includes "independent casino consultants, architectural firms, market research providers, marketing and advertising firms, business intelligence/data/technology firms, and financial professionals with heigh levels of expertise in the casino and hospitality industry."

---

[29] Although a copy of the C3 Study was apparently not furnished to the trial court, a website reference to it was cited to the trial court in plaintiffs' motion reply brief. We note this was not the best means to assure the C3 Study drew the trial court's attention and develop the record. The study is discussed in the submissions of plaintiffs and ANR on appeal, and respondents have not moved to strike it. In any event, even if we disregard the C3 Study, we recognize plaintiffs have argued why the Spectrum Study relied upon by respondents may be flawed and exaggerated.

A-0057-24

As described to us in the briefs, the C3 Study found that "[d]ata from multiple jurisdictions clearly indicates that banning smoking no longer causes a dramatic drop in gaming revenue." The C3 Study also opined that casinos realize certain cost savings when smoking is banned, including reduced costs for HVAC/air handling, mechanical systems, and equipment, as well as less damage to furniture, fixtures, and equipment.

The C3 Study additionally presented numerous findings that counter the Spectrum Study:

- Many of the "case studies" that supposedly show a causal link between smoking bans and loss in casino revenue are complicated by other factors. In Delaware, the smoking ban coincided with the opening of a brand- new casino and resort in Atlantic City and the beginning of the Iraq War. In Illinois, it coincided with the openings of multiple new casinos and the Great Recession.


- Although the machines in smoking sections make more money, this is not because everyone who plays in the smoking section is a smoker. Non-smoking sections are situated away from the main floor of the casino, they tend to contain fewer machines and are partitioned from the main floor with glass to prevent the smoke-filled air from permeating the sections. The study opines that it is likely a non-smoker would elect to sit in the smoking section to play a favorite machine and be closer to the main action and excitement of a casino, while a smoker would have no reason to go to a non-smoking section.
- Although smoking sections perform better than non-smoking sections in casinos that allow smoking, non-smoking casinos do not perform worse than smoking casinos.

- A 2021 study of gamblers from the Pacific Northwest found that the primary reason they chose a particular casino was because of proximity to one's home (32%) and the secondary reason was if smoking was not allowed (26%), only 4% of respondents cited smoking being allowed as a primary reason for patronizing a particular property.

- Post-COVID-19, many casinos across the country have shifted to a non-smoking system and many of these casinos have not experienced a drop in revenue. Some have even been more successful than competitors who allow smoking.

- Discouraging players from taking breaks is contrary to encouraging responsible gambling.

We do not make a de novo appellate determination as to which of these clashing studies is more reliable and persuasive. We must note, however, that neither study was attested to as an expert report for this case. Nor were the authors deposed. Nor did they testify at any hearing where they were cross-examined by counsel or queried by the trial judge. It seems that, as we noted above, the judge's opinion was alluding to the Spectrum Study forecasting economic loss, without mentioning it by name.

We conclude the trial court erred in accepting at face value the premise that ending the casino smoking exemption would necessarily produce a drastic reduction of casino revenues. Given that error, the court's equal protection analysis cannot be sustained at this time as a final determination.

A-0057-24

Applying the injunctive principles we have cited above, we are satisfied the trial court had sufficient grounds to deny plaintiffs a preliminary injunction. Plaintiffs did not yet show a likelihood of success at that stage. But we are not confident, given the disputed critical facts about revenue loss, that a permanent injunction should be denied and that the case should remain dismissed with prejudice. Rinaldo, 387 N.J. Super. at 397.

Under the distinctive circumstances here, in a case that will have a widespread impact on the lives of thousands of people (as in Lewis)[30] and which implicates millions of dollars in tax revenues that support laudable programs, we respectfully vacate the trial court's equal protection ruling and remand for further proceedings.

On remand, the court in its discretion shall allow reasonable mutual discovery to probe into the offsetting disputed factual issues that bear upon a proper equal protection balancing. After that discovery[31] is completed, the court

---

[30] In this regard, we reiterate the Supreme Court's inclusion of "workplace protections" as among the interests pertinent to the equal protection analysis. Lewis, 188 N.J. at 450.

[31] The court stated in its opinion that it "[did] not believe further discovery would provide a legal basis for recovery regarding the special laws claim and a right to safety." The opinion notably did not address, at least explicitly, why discovery on the equal protection claim would be unhelpful.

A-0057-24

should renew its attention to the merits and consider whether a limited evidentiary hearing would be useful in developing the record and evaluating the competing contentions and untested revenue studies. See Rinaldo, 387 N.J. Super. at 397 (noting the value to the court of a "complete record" in ascertaining whether a permanent injunction should be issued). The court should then proceed to conduct, with the benefit of a fulsome record, the balancing required under the three-factor equal protection test.[32]

We take this course of action prudently, and not lightly. By no means do we intend to substitute our judgment on public policy matters for that of the Legislature and the Governor. We are discharging our responsibility in faithfully assuring the equal protection of the laws of our state, and correcting the trial court's mistaken approach in applying the required constitutional methodology.

Nor should this remand be construed to signify that trial judges should routinely allow discovery and consider presiding over evidentiary hearings every time a state equal protection argument is asserted in a pleading or a brief.

---

[32] We acknowledge the trial court's opinion did briefly comment that it was "sympathetic to the health hazards" presented by plaintiffs, but it deemed those hazards inconsequential because the arguments and facts they alleged in their complaint "do not provide a legal basis for recovery."

This is an exceptional case with exceptional stakes, and it must be regarded as such. Of course, we intimate no views on the appropriate outcome of the remand.

V.

For sake of completeness, we briefly comment on plaintiffs' separate constitutional argument that the casino smoking exemption violates the prohibitions on so-called "special" laws set forth in Article IV, § VII, ¶¶ 7, 9(8), which prohibits any "private, special or local laws," including those "[g]ranting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever."

To establish that a measure runs afoul of the special legislation clause, the party challenging the legislation must do more than show that the benefits of the statute apply only to a specific or limited class. See Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 223 (1985). A law is deemed "general" rather than "special" where it "affects equally all of a group who, bearing in mind the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class themselves." Ibid.

"[T]he determining factor is what is excluded and not what is included" in the classification, and "if no one is excluded who should be included, the law is

A-0057-24

general" and passes constitutional muster. Id. at 223 (citation omitted); see also Vreeland v. Byrne, 72 N.J. 292, 299 (1977) ("[t]he test, of course, is whether the classification is reasonable, not arbitrary, and can be said to rest upon some rational basis justifying the distinction.") (citation omitted); Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 20 (App. Div. 2012) ("[t]he test is not what the classification includes, but whether the classification excludes some that should be included"), certif. denied, 211 N.J. 608 (2012).[33]

Our Supreme Court has further explained the method to determine whether a law is improper special legislation:

> Briefly restated, the method of analysis is this: we first discern the purpose and object of the enactment. We then undertake to apply it to the factual situation presented. Finally we decide whether, as so applied, the resulting classification can be said to rest upon any rational or reasonable basis relevant to the purpose and object of the act.
> [Vreeland, 72 N.J. at 300-01.]

Under this analysis, "the judicial task is to decide 'whether there is any conceivable state of facts bearing a reasonable relation to the object of the act which affords a basis for the classification.'" Jordan, 90 N.J. at 433 (quoting

---

[33] We recognize that a few additional groups of employees, such as hotel employees and workers in cigar lounges and tobacco sales, are also included with casino workers in the smoking exemption, but we do not regard their inclusion as being of consequence to our analysis.

Robson v. Rodriguez, 26 N.J. 517, 524 (1958)). "A statute must clearly and irremediably violate[ ] the ban on special legislation to be invalidated." City of Jersey City v. Farmer, 329 N.J. Super. 27, 38 (App. Div.) (citation omitted), certif. denied, 165 N.J. 135 (2000).

The special law provision is analogous to the state equal protection concepts we have already discussed at length. However, unlike the three-factor balancing test set forth in Greenberg, Lewis, and other state equal protection cases, the special law analysis is more akin to a "rational basis" assessment and does not entail balancing.

Assessed by that standard, the casino exemption appears, at least on the surface, to have a sufficient rational basis to justify the denial of plaintiffs' request for a preliminary injunction. In this regard, we incorporate by reference our above observations in Part IV. However, we likewise withhold a final assessment on whether a permanent injunction should be awarded following the remand proceedings, which could hypothetically demonstrate that the exemption singling out casino workers is based upon a flawed and irrational economic premise.

A-0057-24

## VI.

For the reasons stated above, we affirm the trial court's denial of a preliminary injunction and vacate, without prejudice, the denial of a permanent injunction and the dismissal of the case. The case is remanded for further proceedings in light of our disposition. The trial court shall conduct a case management conference within thirty days to plan the remand. We do not retain jurisdiction.

Affirmed in part, vacated in part, and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0057-24